UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

---

CELLINO LAW LLP, and
CELLINO & BARNES, P.C.

      Plaintiffs,

-v-

GOLDSTEIN GRECO, P.C.,
BRIAN GOLDSTEIN, ESQ., and
ALEXANDER GRECO, ESQ.,

          Defendants.

**ATTORNEY DECLERATION IN OPPOSITION
TO PLAINTIFFS' MOTION TO REMAND**

Civ. Action No.: 1:23-cv-00965

---

THE BARNES FIRM, P.C.

      Plaintiff,

-v-

GOLDSTEIN GRECO, P.C.,
BRIAN GOLDSTEIN, ESQ., and
ALEXANDER GRECO, ESQ.,

          Defendants.

---

Brian A. Goldstein, an attorney admitted to practice in this Court, declares under penalty of perjury pursuant to 28 U.S.C. § 1746:

1. I am an attorney duly admitted to practice in New York and this Court. Further, as an individual defendant in this matter and as attorney representing all defendants, I am fully familiar with the facts herein.

## CONTEXTUAL SYNOPSIS

2. I was an attorney at plaintiffs Cellino & Barnes for 20 years. I founded and managed the Mass Tort and Medical Negligence departments.

3. Alex Greco (Alex) worked with me for over seven years.

4. I was required to contribute 10% of my income back to the operation of Cellino & Barnes for payment of overhead, salaries, and advertising for the Mass Tort department. My image, video, credentials, and results were used in TV, print, and internet advertising for the benefit of Cellino & Barnes and Cellino Law. (Exhibit P)

5. Ross Cellino's (Ross) proceedings against his law firm of Cellino & Barnes and Steve Barnes (Steve), his partner of twenty-five years, spanned 2017 through 2020.

6. Attorneys were repeatedly directed "to contact your clients to reassure them that YOU will continue to represent them...."(empasis provided); to "call your clients to blunt the affect of this negative publicity"; to assuage your clients' "concern and consternation" from the "further negative publicity" and to "again contact your clients to put them at ease and assure them... that the client's cases will not be affected." (Exhibit A) (emphasis provided)

7. My clients remained at Cellino & Barnes and followed me, certainly at least in part, because I reassured them that I was and that I would remain their lawyer regardless of the adverse publicity and regardless of what happened to the ultimately dissolved firm. (Exhibit B, C)

8. The attorneys were advised to maintain client contact and, in proximity to the dissolution, to contact each of our clients and to advise them of their options.

9. I was not, Alex was not, and the clients were not privy to the negotiations or the confidential settlement agreement Ross and Steve ultimately agreed to.

10. During the dissolution proceedings Ross testified:

    A.    "I said to [the attorneys]… frankly you can take your cases and… start your own firm." (Exhibit D, p. 67)

    A.    "I informed [the attorneys] that they had options… they can start their own firm"(Exhibit D, p. 68)

    A.    "I told [the attorneys] what their options were; they can start their own firm." (Exhibit D, p. 69)

    A.    "[The attorneys] had an option to start their own firm, yes." (Exhibit D, p. 69)

    (Exhibit D)

11. Prior to dissolution the Mass Tort department alone had generated settlements exceeding $200,000,000.00.

12. While negotiating with Steve, Ross asked me to consider relinquishing a group of 225 of my Mass Tort clients that had originated in California so he could gain other concessions from Steve. Those cases would have followed me to Cellino or to The Barnes Firm, or to any other firm. Ross advised he would personally guarantee payment to me on those cases to make me whole should I join his firm. (Exhibit N)

13. I was asked by both Ross and Steve to take my clients and to join their respective new firms. With Ross' guarantee in writing regarding the 225 cases; compensation packages of salary, percentages, benefits, and sign on bonus, were very similar. I elected to take my cases and join Cellino. (Exhibit N)

14. Upon Cellino & Barnes' dissolution, each of my clients executed unambiguous written direction that "Brian A. Goldstein Esq. is requested to continue representing me on all open matters." (Exhibit E)

15. My clients and their files followed me to Cellino Law.

16. I was the *only attorney admitted* in each of the MDL Courts.

17. I was the *only attorney of record* from inception of my clients' cases to the present.

18. Very shortly after the end of his Cellino & Barnes monthly renumerations and his purchase and renovation of the 48,000 square foot Knox Mansion; Ross claimed "cash flow" problems.  He began unilaterally "changing" attorney contracts.  He began curtailing supplies, restricting disbursements, firing large numbers of staff, directing attorneys to "adjust the low value for your cases," telling attorneys to settle as many cases as quickly as possible, and delaying payment of settlement proceeds to clients. (Exhibit F, G, H)

19. Ross campaigned face-to-face and in writing that he was desperately "in need of as many settlements as possible." (Exhibits F, G, H)

20. From three (3) lawyers, four (4) legal assistants/paralegals and one (1) secretary  in the Mass Tort department; Ross quickly terminated one lawyer, two of the four legal assistants, the only secretary, and advised that one of the two remaining legal assistants would be reassigned and would not be replaced.

21. On June 24, 2021 Ross held a general attorneys' meeting and advised the attorneys we should all consider taking our cases and leaving and that he would leave with his cases if he were in our shoes. (Exhibit H)

22. I had an individual meeting with Ross on June 27, 2021.  We discussed the difficulty in maintaining the viability of the Mass Tort department in the absence of any advertising by Ross.  We discussed the increasing difficulties properly servicing Mass Tort clients because of the drastically reduced staffing.  I voluntarily consented to a 20% salary reduction.  I voluntarily consented to a 30% reduction on future personal referral cases.

23. In January, 2022 Ross scheduled an after hours meeting with me and advised he would "like" me to stay but that he no longer wanted to honor his guarantee of payment on the 225 cases he had me relinquish.  He was not prepared to maintain the Mass Tort department.  He felt "horrible" to suggest that I leave and take my clients but it probably would be for the best.

24. Ross and I had a series of subsequent meetings spanning the next several months. He reiterated his decision to close the Mass Tort department, his determination not to have any Mass Tort cases, his intention to not pay me on the 225 cases I relinquished despite his written guarantee, and his demand he wanted no further responsibility for Mass Tort clients.  We came to agreement on the timeline to wind down at Cellino, attorneys' fees in the various categories of cases, the monies he had guaranteed and the remainder of the sign on bonus, and the logistics in transferring of all files.

25. July, 2022 Alex and I filed with the Department of State to form Goldsten Greco, P.C.

26. August, 2022, weeks before Alex and my departure, Ross coordinated with Cellino's COO (Annmarie Cellino) and IT Director (David Blaszak) <u>to facilitate the transfer</u> of "100%" my client's files to Goldstein Greco. (Exhibit I)

27. August 2022, weeks before Alex and my departure, Ross unambiguously confirmed in writing:

- "**<u>You have agreed to take 100% of the Mass Tort files</u>** so that there will be **<u>no obligation of CL to follow up on any of Mass Tort files</u>**."

- **"there are 600+ files that need to be attended to."**

- "You will work with Granit to **<u>digitally copy the files</u>** that will be following you and Alex."

- **"You will move to your new office** on or before 9/30/22."

(Exhibit J)(emphasis provided)

28. My clients' choices were (a) to come with me to Goldstein Greco or (b) Cellino would withdraw and leave them without representation.

29. Alex and I would be the Eighteenth and Nineteenth lawyers to depart Cellino in its short existence. (Exhibit K)

30. As I wound down the department at Cellino as "of counsel" to Cellino; Ross had Cellino staff manually box up the hundreds of my clients' files, piling dozens of moving boxes in the hallway, and "digitally copy the files that will be following you" to Goldstein Greco. (Exhibit I, J)

31. By the end of September, 2022 Cellino had physically divested itself of every single physical file, confirmed it no longer had any ongoing responsibility for my clients, and demanded Cellino be formally withdrawn on every single one of my clients that did not leave Cellino for Goldstein Greco. (Exhibit J)

32. Ross directed any client who inquired, *including his immediate relatives,* to follow

me to Goldstein Greco to insure that "100%" of the clients were gone:

- "As you are aware, **Cellino Law is no longer pursuing [mass tort] cases**"

- "I am ... able to offer **all Cellino Law mass tort cases**... continued seamless representation with the same attorneys"

- "Should you wish me to continue pursuit of your case without interruption **along with all other Cellino Law mass tort cases,** kindly sign and return the enclosed/attached retainer agreement"

- "**cc: AnnMarie Cellino** (acellino@cellinolaw.com)"

(Exhibit L; first name redacted)(emphasis provided)

33. In reliance upon Ross's agreement and representations; Alex and I undertook the

many steps, the many obligations, and the many responsibilities necessary to open

Goldstein Greco on October 1, 2022.

34. On October 7, 2022, before we could even unpack, Ross emailed a "proposal" – a

nine page document obviously in preparation long in advance - which failed to

contain the terms we had agreed upon.  (Exhibit M)

35. Ross' "new" proposal demanded up to 80%, 89%, 90% and 95% of gross attorneys'

fees to be paid to Cellino. (Exhibit M)

36. The document Ross authored unambiguously speaks for itself:

- **GOLDSTEIN shall affirmatively contact each client** listed on the annexed Exhibits **for the purposes of obtaining a signed retainer agreement with GOLDSTEIN'S new firm, GOLDSTEIN GRECO, P.C.**

- CELLINO LAW, LLP  and GOLDSTEIN acknowledge and agree that **it is the best interest of the client's** [sic] listed on the annexed Exhibit **to continue to be represented by GOLDSTEIN** given the nature of their respective cases.

- **GOLDSTEIN** agrees that he **will endeavor to obtain from each and every client ... a signed retainer with his firm** and will **not leave any Mass Tort cases for CELLINO LAW LLP** to process since CELLINO LAW LLP does not have any attorney in our office experienced to handle Mass Tort Cases.

- **If any clients refuse to retain GOLDSTEIN GRECO, P.C.,** GOLDSTEIN will **move to withdraw** from the case and shall act as co-counsel to **Cellino Law LLP in order to officially withdraw.....**"

- ... formally withdraws .... in connection with their retainer with Cellino Law LLP such that **Cellino Law, LLP no longer has any legal obligation to continue representing the client...**

(Exhibit M)(emphasis provided)

37. Attempts to return to the original agreement and additional good faith efforts to negotiate over the ensuing weeks and months unfortunately faced a "moving target."

38. Ross then began withholding monies due me for cases that I had settled while at Cellino.

39. Regardless, I did not sue Ross. I had ongoing discussions with Ross, Ross' Managing Attorney, and subsequently Ross' then counsel Terry Connors. (Exhibit AB)

40. During this interval, as soon as the first case resolved at Goldstein Greco, I reached out to Ross.

41. *Jackson/Winans v. Newfane Rehabilitation*, Niagara County Index No. E169868/2019, was a personal referral to me of a Niagara County nursing home case. Per my contract with Cellino (Exhibit N), per Cellino's policy (Exhibit O), and per Ross' personal "philosophy ... that [attorneys] should get fifty percent of the fees that they bring in if its personal business." (Exhibit D, p. 47) I was entitled to 50% of attorneys' fees *even if the case had resolved at Cellino.*

42. I extended the respect and courtesy to Ross of promptly sending him copies of the Order settling the case (inclusive of attorneys' fees), the release, settlement statement (executed by the client with Cellino's full 50% of the fees), insurance company check, client affidavit (offering Cellino full 50% of the fees), lien payment, a check reimbursing Cellino for 100% of its costs, and my <u>confirmation on behalf of the client to pay him the full 50% of the attorneys' fees</u> notwithstanding the additional work and settlement at Goldstein Greco. (Exhibit Q)

43. Ross' response was to sue me in *Erie* County.[1]

44. Ross demanded "<u>100% of the fee</u>." (Exhibit R)

45. Ross demanded Ms. Jackson pay a 33 1/3% fee in this malpractice case contrary to the client's retainer and New York Judiciary Law § 474-A. (Exhibit R)

46. It is telling that Ross' lawsuit was devoid of any suggestion that Alex and my leaving Cellino was in any manner improper. (Exhibit R)

47. It is also noteworthy that Ross filed in *Erie* County to avoid the *Niagara* County Judge who had presided over the underlying case and who had just awarded Cellino "only" 25% of attorneys' fees in a sister "personal referral" case the Niagara County Judge had also presided over.[2]  (Exhibit S)

48. Once again, I did not sue Ross.

49. At or about this time, Ross hired new counsel.

---

[1] *Winans*, inclusive of attorneys' fees, settled in Niagara County by Order on November 16, 2022. It was not until March 31, 2023 that Cellino & Barnes and Cellino (but not The Barnes Firm) brought the initial action intentionally avoiding the Court that had already settled the matter. By subsequent "amendment," and a second action, Plaintiffs attempt to "encapsulate" hundreds of completely unrelated active federal court cases pending before fifteen federal courts into the settled state court action.

[2] After filing in *Erie* County, Plaintiffs next opposed transfer to the underlying court in Niagara County which settled the matter  Plaintiffs then fought to have the case removed from the Commercial Division, strenuously arguing there were no contract claims (Exhibit AA) – a position directly contrary to that now taken.

50. I had taken the time to identify the handful of cases that were ripe for fee determination. A limited number of cases were identified in four MDL litigations. I brought fee petitions in those appropriate cases in their proper underlying respective Courts – the Courts that had overseen these cases and the respective entire MDL for years. The correct underlying Courts. The Courts in the best position to assess and determine attorneys' fees in the cases before them – *in the only cases that were ready and appropriate for fee determination.* (Exhibits T, U, V, W)

51. *A year after* negotiated departure, Ross' new counsel (Barnes' former counsel against Ross) then rushed to "Amend" *the single settled county court nursing home case* to add *"hundreds" and "perhaps a thousand" unidentified cases.* (Exhibit 2 to the Attorney Declaration of Christoper Berloth dated October 12, 2023)

52. *A year after* Ross kept me on payroll, kept me in my office at Cellino, made me "Of Counsel" *to act on behalf of Cellino,* had Cellino personnel box up each and every file for me to take with me, assigned Cellino's IT director to assist in my software selection and to copy each and every electronic file for me, ensured I took "100% of the Mass Tort files" *and* "not leave any Mass Tort cases for Cellino" and that he have "no obligation to continue representing [my] clients;" Ross (through his new counsel) suddenly and for the first time alleged that I stole the files *that Ross had boxed up for me, copied for me, and insisted I take.*[3] (Exhibits J, M)

---

[3] Each fee petition sets forth the various retainer dates for each client (Exhibits T, U, V, W). No Goldstein Greco retainers predate Ross' direction to have all Mass Tort clients leave Cellino. Ross insisted that I "affirmatively contact each client for the purposes of obtaining a signed retainer agreement." (Exhibit M)

53. The "Amended" Complaint consists of forty-eight (48) pages of vitriol (Exhibit X); but not the name of a single case, a single client, a single case type, a single court, a single plaintiff, or a single defendant. (Exhibit 2 to the Attorney Declaration of Christoper Berloth dated October 12, 2023)

54. To complete the picture, Ross' new attorney (Barnes' former counsel against Ross) next filed a "related" action on behalf of The Barnes Firm (an entity which Alex, I, and the clients have no relationship whatsoever with) parroting the Cellino "amended" filing. (Exhibit 3 to the Attorney Declaration of Christoper Berloth dated October 12, 2023).[4]

55. The actions were consolidated by stipulation.

56. While attorneys may reasonably rely upon the veracity of their clients, and while some conflicts may be subject to waiver, it cannot be ignored that Ross' new counsel (Barnes' former counsel against Ross) was personally knowledgeable:

> Ross Cellino "[has] a pretense to manufacture claims", asserts "meritless" legal theories, manufactures "allegations [that] are pretextual [and] false", induced "substantial amounts" of investment which were detrimentally relied upon, "refused to engage in good faith settlement negotiations", "engaged in acts of bad faith", engaged in improper solicitation, made "threats", "improperly attempted to terminate ... valid agreement", filed "baseless" pleadings, engaged in "malicious and defamatory" conduct, had "issues [with] credibility", "violated... Court.. Order", "illicitly solicited... attorneys and employees", "[the]

---

[4] The October 12, 2023 Declaration of Mr. Berloth is inaccurate in that there was no mention of The Barnes Firm as a potential plaintiff nor was there a "directive" regarding a potential "Barnes Firm" action at the conference before the Hon. Timothy J. Wlaker, J.S.C. on June 1, 2023.

mass torts division is extremely successful and efficient in its handling of the cases", "[the mass torts division] clearly optimizes the firm's resources and effectiveness", Ross attempted to "pillage and pirate… attorneys and employees", makes allegations that are "patently false", makes allegations that are "entirely disingenuous, speculative, conclusory, and unsupported", seeks a status in which "clients will be substantially harmed", engaged in "disparaging and damaging conduct", attempted to disrupt disbursements, put forth allegations that are "disingenuous and lack credibility", and engaged in widespread "reprehensible conduct."

(Exhibit X)

57. Ross' new counsel (Barnes' former counsel against Ross) "caught" Ross Cellino engaging in multiple surreptitious "unauthorized and improper actions", pirating "confidential and proprietary information", "improperly providing [third-parties] access" to databases for the unlawful "copying and downloading [of] confidential and proprietary information", violating of Court orders, and "violating fiduciary duties." (Exhibit Y)

58. The tactic of disparaging, suing, and attempting to strangle the lawyers who for decades ensured the principals' extraordinary personal success is evidenced by the 108 Cellino & Barnes and Cellino Law matters listed throughout New York State; 66 are fee disputes Cellino created with dozens of other law firms (66/108); the next 4 are matters of Ross Cellino suing his own partner and his own law firm (4/108). There are an additional 4 are lawsuits brought by Cellino clients alleging Cellino committed

legal malpractice (4/108).  Leaving matters where Cellino represents an actual client in an actual personal injury matter totaling 30/108. (Exhibit Z)

59. *A year after abandoning these clients*, Ross purportedly "assigned" their "files" to the firm and the attorney he had spent years litigating and railing against.[5]

60. As an initial matter, it is more than doubtful that Ross had anything to "assign":

- Cellino affirmatively directed and facilitated that 100% of these clients **must leave Cellino**.

- Cellino affirmatively directed and facilitated that **Cellino be "officially withdrawn"** on each and every Mass Tort case.

- Cellino directed and facilitated "**no obligation of CL to follow up on any of Mass Tort files."**

- Cellino directed and facilitated that **"Cellino Law, LLP no longer has any legal obligation to continue representing the client."**

- Cellino affirmatively directed and facilitated the move of each and every physical file to Goldstein Greco such that **Cellino retained no physical possession of any physical file.**

- Cellino affirmatively directed and facilitated **all the digital files be sent to Goldstein Greco**.

- **Cellino did "not have any attorney in our office experienced to handle Mass Tort Cases."**

(Exhibits J, M)(emphasis provided)

61. First, demanding these clients leave or that Cellino would withdraw is a *prima facie* cause discharge.  When a firm discharges a client, whether that firm that demanded a client leave can subsequently claim entitlement to fees, must be determined in the negative.

---

[5] None of these clients were aware, were advised, or consented to any purported "assignment."

62. Second, demanding no "obligation... to follow up on any of Mass Tort files" and to "no longer have any legal obligation" forgoes Cellino's entitlement to "referral" fees.

63. Third, Cellino voluntarily divested itself of these clients' files; terminating any retaining lien. *Bretillot v. Burrow*, No. 14CV7633 JGK MHD, 2015 WL 5306224, at *8 (S.D.N.Y. June 30, 2015).

64. Fourth, Any potential Judiciary Law § 475 "charging lien" in the case at issue, *Jackson/Winans v. Newfane Rehabilitation*, Niagara County Index No. E169868/2019, is a **dispute between the client and Cellino**. Ms. Jackson promptly and unequivocally offered - and re-offered – Cellino the full 50% of the fee (Exhibits B, C, Q). Cellino's refusal was a refusal of the client's offer of payment. Cellino's refusal *created* the dispute and the dispute is one between the client (who is not a party here) and Cellino.

65. Plaintiffs' gambit is now to try to jam hundreds of completely unrelated federal court clients with cases nowhere near resolution in active litigation before over a dozen federal courts into a settled state court action after *Ross refused full payment offered by the client*.

66. These federal court clients retained Goldstein Greco when Ross refused to continue representing them upon threat of withdrawal, when Cellino divested itself of the files, and when Cellino demanded and insured no ongoing responsibility for them.[6] (Exhibits J, M)

---

[6] Ross demanded "no... legal obligation to continue representing" these clients, that he would "officially withdraw" on any client that did not leave, and insisted that I take "100% of the Mass Tort cases" and "not leave any Mass Tort cases" at Cellino. (Exhibits J. M)

67. Each and every one of these clients had *rejected* representation by The Barnes Firm upon the dissolution of Cellino & Barnes (Exhibit E). These clients never retained The Barnes Firm. These clients did not consent to any agreement between Cellino and Barnes. These clients did not consent to any "assignment" of their cases. And these clients remain completely unaware of any "assignment" of their cases.

68. There is zero privity between these clients and The Barnes Firm. Nor was or is there privity between Alex or I and this Barnes Firm.

## THE "AMENDED COMPLAINT"

69. Cellino (and purported "assignee" Barnes) seeks to "encapsulate" "each and every underlying party" – *i.e.*, <u>hundreds of active *federal court* plaintiffs</u> – from their respective federal courts *where they are in active litigation* to the single settled Erie County state court case after Ross' refusal to accept full payment.

70. Cellino (and purported "assignee" Barnes) includes cases where fee petitions are pending before those courts; seeking to prevent those courts from even hearing the petitions pending before them.

71. Cutting through the rhetoric, Cellino (and purported "assignee" Barnes) wants to preemptively and permanently enjoin over a dozen federal courts from their ability to assert and exercise jurisdiction and discretion in hundreds of diverse federal cases *in active litigation* – <u>*some with fully briefed pending petitions*</u> -  in order to

piggy back ("encapsulate") them onto a *single settled nursing home case* in state court in Erie County with no connection whatsoever to those cases.

72. Cellino's (and purported "assignee" Barnes') grab was commenced by a frenzied "Amended Complaint" - to the single nursing home case *after* that case was settled, *after* attorneys' fees were set, *after* Celino was repaid 100% of its costs; *after* Cellino was offered its full fee by the client, and *after* our fee petitions were pending – without bothering to identify a single case, without bothering to name a single plaintiff, without bothering to name a single defendant, without bothering to identify a single court, without bothering to identify if the cases were even filed, without regard to the posture of any case, and without regard to whether any case was even appropriate for fee allocation. (Exhibit 2 to the Attorney Declaration of Christoper Berloth dated October 12, 2023)

73. As set forth in our Notice of Removal, it was not until August 15, 2023 that the Plaintiffs finally identified a single one of the "hundreds" "or perhaps a thousand" of the unidentified cases.

74. Upon providing lists claimed to be at issue (Plaintiffs' "buckets" contain numerous inaccuracies), I identified cases pending in fifteen different MDL District Courts; and this matter was promptly removed.

75. As of this date, our fee petitions, and Plaintiffs' motions to dismiss same, remain pending  before the District Courts in Maryland and Northern District of Georgia.[7]

---

[7] Plaintiffs' Motions to Dismiss were brought by Plaintiffs Cellino & Barnes and Cellino Law only; not The Barnes Firm.

## THE FEE PETITIONS

76. The District of New Hampshire (MDL No. 2753, Atrium Medical Corp. C-Qur Mesh Products Liability Litigation) dismissed our fee petitions in 13 cases[8] without reaching the merits; concluding the Court lacked ancillary jurisdiction. (Exhibit 1 to the Attorney Declaration of Christoper Berloth dated October 12, 2023)

77. Notice of Appeal was timely filed. (Exhibit AB)

78. The Northen District of California (MDL No. 2741, Roundup Products Liability Litigation) dismissed our fee petition regarding 28 cases based upon its discretionary right without reaching the merits.  (Exhibit AC)

79. We do not intend to challenge this decision as the Court properly exercised its *discretionary right*.

80. Fee petitions remain pending in 9 cases before the District of Maryland (MDL No. 2775, Smith & Nephew Brimingham Hip Resurfacing).

81. Fee petitions remain pending in 6 cases before the Northern District of Georgia (MDL 2782, Ethicon Physiomesh Flexible Composite Hernia Mesh Products Liability Litigation.

82. Those Federal MDL Courts may choose to exercise their ancillary jurisdiction, or may choose not to.  Those courts may exercise their discretion to hear the fee petition, or they may exercise their discretion not to.  Or they may choose to fashion a different remedy.  **Simply put, it is within those Federal MDL court's discretionary rights *to manage their cases*.**

---

[8] The District of New Hampshire required an individual fee petition for each client.

83. Likewise, apart from the handful of cases subject to the already filed fee petitions that were ripe for fee determination; **there are 600+ *other* clients' cases that remain *actively litigated* and *pending* before *over a dozen individual Federal MDL Courts*.** Each of those Federal Courts may choose to exercise their ancillary jurisdiction, or they may choose not to; they may exercise their discretion to hear fee petitions when appropriate, or they may exercise their discretion not to hear fee petitions, or they may choose to fashion a different remedy. Again, **it is within each Federal MDL court's discretionary right *to manage its cases*.**

84. Every MDL court, in normal course, regularly exercises control, manages, and addresses attorneys' fees (duplicate filings, common benefit attorneys' fees, steering committee attorneys' fees, science committee attorneys' fees, motion committee attorneys' fees, *etc.*) under authority *broadly extending even to jurisdiction over private contracts between a client and their chosen counsel.*

85. One of many examples is Hon. Judge Eldon E. Fallon's review of jurisdiction in MDL-1657 Vioxx Products Liability Litigation; noting the ultimate Settlement Agreement itself (settlement agreements have *not yet even been contemplated* in *any* of the multiple MDLs managing the hundreds of cases *in the middle of litigation* which are prematurely made at issue by the Plaintiffs here) may specifically incorporate the MDL Court's authority to address attorneys' fees. (Exhibit AD)

86. Judge Fallon cited with favor: *In re Zyprexa*, 424 F. Supp 2d at 492 ("The judiciary has well-established authority to exercise ethical supervision of the bar in both individual and mass actions."); *Karim v. Finch Shipping Co., Ltd.*, 233 F. Supp. 2d 807, 810 (E.D. La. 2002), *aff'd*, 374 F. 3d 202 (5th Cir. 2004) ("Among the broad

equitable powers of a federal court is its supervisory capacity over an attorney's contingent fee contract"); *Roquist v. Soo Line R.R.*, 692 F.2d 1107, 111 (7th Cir. 1982) ("Even when the validity of the fee contract itself has not been challenged by the parties, it is within the court's inherent power of supervision over the bar to examine the attorney's fee for conformance with the reasonable standard of the Code of Ethics.")

87. These hundreds of cases in the middle of active litigation, hundreds of cases nowhere near resolution, hundreds of cases with widely variant litigation proceedings, hundreds of cases actively being managed before *over a dozen* MDL courts throughout the country, hundreds of cases where the terms of any potential resolution or settlement are utterly unknown and unestablished (if there will even be a resolution for the plaintiffs), hundreds of cases where *over a dozen* MDL courts are expected to review and determine propriety of various attorneys' fees, are rightfully subject to the authority vested in each of the courts managing their cases before them.

88. Plaintiffs' attempt to permanently, completely, and preemptively wholesale **enjoin over a dozen federal MDL Courts** from **even the ability to consider** the exercise of their authority in hundreds of **their cases** and to "encapsulate" them into a single settled nursing home case in state court Erie County based upon Ross Cellino's refusal of payment and demand for "100% of the fee" is - at best - premature and dubious.

## ANCILLARY JURISDICTION (AND DISCRETION)
## <u>RESTS WITH THE FEDERAL COURTS IN WHICH THE CASES ARE PENDING</u>

89. <u>It is solidly within the purview of each one of the multiple Federal MDL Courts</u> to

choose to exercise their ancillary jurisdiction or not; to use their discretion to hear

fee petitions or not, or to fashion whatever other remedy the Court deems

appropriate in <u>their cases</u> pending in <u>their Courts</u>:

> **It is well-settled** that '[a] <u>federal court may</u>, in its discretion<u>, exercise</u>
> <u>ancillary jurisdiction to hear fee disputes</u>... when the dispute related
> to the main action...
>
> *Chelsey v. Union Carbide Corp*; 927 F.2d 60, 64 (2d Cir.1991)(*quoting Cluett,
> Peabody & Co. v. CPC Acquisition Co.,* 863 F2d 251, 256 (2d Cir. 1988).
> *See also Petition of Harley v. Browne,* 957 F. Supp. 44 (S.D.N.Y. 1997);
> *Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 395; 100 S. Ct. 2447, 110 L.
> Ed. 2d 359 (1990); *Petition of Rosemand Colin Freund Lewis & Cohen,* 600
> F. Supp 527, 531 (S.D.N.Y. 1984); *Schmidt v. Zazzara,* 544 F. 2d 412, 413-
> 14 (9th Cir. 1976).

90. It is well settled:

> As an initial matter, this Court notes that **it is proper for this Court to**
> <u>exercise jurisdiction..... over [the] claim for attorneys' fees</u>. **Under**
> **the doctrine of** <u>ancillary jurisdiction,</u> a federal court may exercise
> jurisdiction over a claim for which no subject matter independently obtains
> '"if the claim is sufficiently related to an initial claim properly before the
> court" *Chelsey v. Union Carbide Corp.,* 927 F.2d 60, 64 (2d Cir. 1991)
> (*citing Baylis v. Marriott Corp.,* 843 F.2d 658, 663 (2d Cir. 1988).
>
> *Petition of Harley v. Browne,* 957 F. Supp 44 (S.D.N.Y. 1997). (emphasis
> provided)

91. Additionally:

In light of this **overwhelming authority**, **this Court** finds that is **may, in its discretion, exercise jurisdiction** over the instant petition.  Moreover, because this Court is familiar with the facts underlying this litigation….  Judicial economy and the interests of the partied in an expeditious disposition of this matter are **best served by this Court's exercise of ancillary jurisdiction** over HB's petition **to enforce its attorney's lien**.

*Petition of Harley, supra*, at 47.  (emphasis provided)

92. Custom, practice, judicial economy, and fairness are advanced when fee disputes are adjudicated in the proper underlying court:

> **The decision [of the Federal Court] to entertain an ancillary claim is discretionary** and turns upon "whether the policies of 'judicial economy, convenience, and fairness to litigants' are furthered by the assumption of jurisdiction."
>
> *Petition of Harley, supra*, at 46 (emphasis provided) (*quoting Stamford Bd. Of Educ. v. Stamford Educ. Ass'n*, 697 F.2d 70, 72 (2d Cir. 1982).  *See also, United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S. Ct. 1130, 1139, 16 L. Ed. 2d 218 (1966).

93. While not a federal case; it is instructive, well recognized, a restatement of well settled custom and practice in New York, and common sense that the proper venue to adjudicate a fee dispute is the underlying court:

> …. **The attorney… must obtain enforcement of his lien by appropriate order of the court in which the action is pending** (*Hovey v Elliott*, 118 NY 124; Judiciary Law §475 ["The court upon the petition of the client or attorney may determine and enforce the lien"]).
>
> *People v. Keefe*, 50 N.Y. 2d 149 at 156 (1980)(emphasis provided).  *See also, Capoccia v. Brognano*, 126 A.D. 2d 323 (3rd Dept. 1987)

**CONCLUSION**

The Defendants respectfully request this Honorable Court enter an Order denying Plaintiffs' Motion to Remand so that the federal cases may be severed and transferred to their proper respective MDL courts for further proceedings in the management of their cases; or, in the alternative, for a threshold determination regarding whether or not Cellino retains entitlement to fees; the validity of a purported "assignment" of clients' cases by Cellino; whether Cellino & Barnes and/or this Barnes Firm have standing; and the *Jackson/Winans* client as a necessary party; together with such other and further relief as this Honorable Court deems proper.

Dated:  November 30, 2023
        Buffalo, New York

                                        GOLDSTEIN GRECO, P.C.

                                By:     s/ *Brian A. Goldstein*

                                        Brian A. Goldstein
                                        *Attorneys for Defendants*
                                        *GOLDSTEIN GRECO, P.C.,*
                                        *BRIAN GOLDSTEIN, ESQ., and*
                                        *ALEXANDER GRECO, ESQ.*
                                        2354 Wehrle Drive
                                        Buffalo, New York 14221
                                        (716) 568-9090
                                        bg@goldsteingreco.com

## CERTIFICATE OF SERVICE

I hereby certify that on November 30, 2023, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send the notification of such filing to all attorneys of record.

/s/ Brian A. Goldstein